IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 16-mj-01161-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**2.     Adam C. Shryock**

      Defendant.

_____

**DEFENDANT'S MOTION FOR A VARIANT SENTENCE**
_____

Mr. Shryock, through undersigned counsel, respectfully requests the imposition of a sentence of 5 years' probation, which varies from the advisory guideline range. As grounds, he states as follows:

**I.    Nature and Circumstances of Mr. Shryock's Offense**: 18 U.S.C. § 3553(a)(1)

In March of 2014, Mr. Shryock, through counsel representing him in a civil matter in Denver District Court, responded to a request for documents by the U.S. Attorney's office. In January of 2015 the government received information pertaining to the civil matter in Denver District Court, which began in 2013, from the Consumer Protection Section of the Colorado Attorney General.

Based on the materials received an information was filed in October of 2016, at which time a summons was issued. Doc. 1. Mr. Shryock was placed on a personal recognizance bond which he has remained on for 15 months.

In April of 2017 Mr. Shryock pled guilty to Count 1 of the information accepting responsibility for willfully failing to file individual tax returns for tax years 2010 to 2013. Doc. 22 (Plea Agreement), pg. 6.  Mr. Shryock also failed to file corporate tax returns for tax years 2011 to 2013.  Id.  Mr. Shryock owes the IRS $430,970.  Id.[1]

II. **Personal History and Characteristics of Mr. Shryock**:   18 U.S.C. § 3553(a)(1)[2]

    A.    **Personal History**.

        1. Family and Personal Relationships.

Mr. Shryock is 38 years old, and was born in Wichita, Kansas.  He was reared by his mother and father in Augusta, Kansas, where his parents continue to reside, and maintains a positive relationship with them.  Mr. Shryock has 2 siblings that also reside in Augusta, however, due to the age difference between them, they do not share close relationships.

Mr. Shryock has had a significant other, Rachel Marlow, for 2 years.  The two live together, and Ms. Marlow was present for a home inspection in May of 2017 by U.S. Probation.  There was no evidence of weapons or illegal drug at the home, Ms. Marlow was cooperative and cordial, and the home was determined to be suitable for supervision.

Prior to his relationship with Ms. Marlow he was in a relationship with Alyssa Lester for 1.5 years.  Prior to that he was engaged to Amy Maierson for 3 months.

        2. Education.

---

[1] The "Offense Conduct" in the Presentence Investigation Report (hereafter PSR, Doc. 38) includes a recitation of the statement of facts found in the "Plea Agreement" (Doc. 22).  PSR paragraphs 7-14.  The PSR also includes "Additional Information" in paragraphs 15-17 that the author "believes is relevant to sentencing".
[2] This information is derived from Part C of the Presentence Investigation Report (Doc. 38), unless otherwise noted.

Mr. Shryock graduated from Augusta High School in 1998, and from 1999 to 2004 he attended Butler Community College and the University of Kansas and studied psychology, but did not graduate.[3]

    3. <u>Employment</u>.

His first job after attending college was co-owning a business with his cousin from 2004 to 2007. The business sold breathing equipment to asthma sufferers, through which he earned approximately $36,000 per year, gross. From 2003 to 2009 Mr. Shryock operated a marketing and advertising company during which time his income varied based on sales.

From 2010 to 2013 Mr. Shryock owned the merchandizing company "Boobies Rock". Over 4 years ago, in June of 2013, a civil complaint was filed in Denver District Court (2013CV32857). In March of 2015, after a court trial, Mr. Shryock was ordered to pay civil penalties resulting in a $4,000,000 judgment, which was satisfied partially by an Asset Freeze Order, plus attorneys' fees. Mr. Shryock and his corporation were also permanently enjoined from engaging in charitable sales promotion, making charitable solicitations, engaging in managerial or oversight activities for any charitable organization, and benefitting directly or indirectly from any relationship with any charitable organization. Mr. Shryock has been punished and deterred by the nearly 3 years of litigation and resulting sanctions imposed in the civil proceeding concluded in January of 2016.

---

[3] Mr. Shryock has sought records of his attendance and will provide them to the court if obtained.

Mr. Shryock currently runs a merchandising company that sells apparel and toys at kiosks mostly located in malls. The company has approximately 20 employees and Mr. Shryock's earnings vary.

    4. <u>Psychological Counseling</u>.

The PSR recommends participation in cognitive behavioral treatment at the direction of a probation officer as a condition of supervision.[4] Mr. Shryock has been in outpatient psychiatric treatment since August of 2017.[5] Through consultation with Dr. Gutterman Mr. Shryock has addressed "both unconscious and conscious psychological factors that have contributed to his poor decision-making that led to his current legal difficulties." Id. Dr. Gutterman has found that Mr. Shryock "does not demonstrate features of a Narcissistic or Antisocial Personality Disorder that would be unresponsive to psychological treatment", but "in fact, he manifests personality features, such as being forthright, self-reflective and sincere, all of which leads to a significantly more favorable prognosis."

    **B. Criminal History**.[6]

Mr. Shryock receives a criminal history point for a sentence of suspended jail time and a fine for a DUI conviction he sustained 9 years ago. He receives two additional criminal history points for a sentence of 90 days jail (for which he served 60 days) and 4 years of probation for a misdemeanor theft conviction and deferred judgment on a class 5 felony

---

[4] PSR, pg. R-2.
[5] See Attachment A - Letters from Dr. Gary Gutterman, M.D., P.C., dated August 21, 2017, December 12, 2017, and January 10, 2017.
[6] This information is derived from Part B of the PSR, pages 7 through 10 unless otherwise noted.

that was imposed in May of 2016. He has been compliant with the conditions of his probation for 19 months.

Mr. Shryock will remain under supervision by the Economic Crime Unit of the Adams County, Colorado, Probation Department for another 2.5 years, until May of 2020. The conditions of his supervision are significant and require Mr. Shryock to maintain a residence and report a change of address to his probation officer, report to his probation officer regularly, answer inquires by his probation officer, report law enforcement contact, notify 3rd parties of his criminal record as directed by probation, submit to substance abuse testing as directed, and maintain employment.[7]

The standard conditions of his probation preclude Mr. Shryock from violating the law, leaving the state without permission, and associating with charities. The additional conditions of his supervision by the Economic Crimes Unit require Mr. Shryock to disclose to his supervising officer the nature of his employment, his business and personal financial information, Federal and State tax returns, court judgments, and credit reports. Additionally, Mr. Shryock is precluded, without prior authorization, from acquiring new debts, investing or lending money, entering into financial contracts, opening accounts, purchasing or leasing a vehicle, entering into real estate transactions, accessing or controlling assets of any group, managing any groups, or creating a new business. Id.

Mr. Shryock and his codefendant were required to pay $50,000 in restitution, jointly and severally, which has been paid in full. Id.

**III.   The United States Sentencing Guidelines:  18 U.S.C. § 3553(a)(4)**

---

[7] See Attachment B - Docket Sheet 15CR1236 and 15CR601 and Conditions of Deferred/Probation, 15CR1236.

5

**A. The Tax Guideline Does Not Exemplify the USSC's Characteristic Institutional Role and Yields a Sentence that is Greater Than Necessary Under 3553(a)**.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point." 28 U.S.C. § 994(m).[8] The original Commissioners quickly abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead, purportedly based the guidelines on empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1, Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).[9]

The Supreme Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission

---

[8] The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

[9] In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id*. at 348-50.

"did not take account of empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence `greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id*. at 109-10.

In Chapter One, Part A (4), of the Guidelines the Sentencing Commission outlines its "Resolution of Major Issues" in a policy statement. The issues of "probation and split sentences" are addressed in subsection (d), and the Commission states the following:

> Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, *tax evasion*, antitrust offenses, insider trading, fraud, and embezzlement, that in the Commission's view are "serious". The Commission's solution to this problem has been to write guidelines that classify as serious many offenses for which probation previously was frequently given and provide for at least a short period of imprisonment in such cases. The Commission concluded that the definite prospect of prison, even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.

Notably, this resolution does not address willful failure to file a tax return, and lists only tax evasion as "serious" economic crime related to tax. Here, the applicable Guidelines [§§ 2T1.1 & 2T4.1] are not the product of the Sentencing Commission employing an empirical study, as its designated mission, to establish past sentencing practices for convictions of this crime. Because the Commission failed to rely on empirical data or national experience in promulgating or amending §§ 2T1.1 & 2T4.1, and thus failed its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S.Ct. 840, 843 (2009).

For starters, the Commission disregarded empirical data of past practice and pre-guidelines sentences in tax fraud cases when it promulgated § 2T1.1. Under pre-guidelines practice, 50% of tax fraud defendants received a probated sentence, the remainder served average sentences of 12 months. This is a drastic difference from the

7

promulgated guidelines where every single defendant receives a recommendation of imprisonment, and most recommendations are far removed from the pre-guidelines average of one year. In the "background" section following § 2T1.1's application notes, the Commission readily admits to this deviation:

> Under pre-guidelines practice, **roughly half of all tax evaders were sentenced to probation without imprisonment**, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced. The Commission believes that any additional costs of imprisonment that may be incurred as a result of the increase in the average term in revenue are inconsequential in relation to the potential increase in revenue. According to estimates current at the time this guideline was originally developed (1987), income taxes are underpaid by approximately $90 billion annually. Guideline sentences should result in small increases in the average length of imprisonment for most tax cases that involve less than $100,000 in tax loss. The increase is expected to be somewhat larger for cases involving more taxes.

*See* USSG § 2T1.1, background commentary.

The Commission has further disregarded its designated mission by failing to monitor the national experience since the promulgation of the Guidelines and amend them accordingly. Despite the Commission's blatant disregard of past practice, sentencing courts post-*Booker* seem to be drifting back towards the pre-guidelines sentencing practices where a majority of tax fraud defendants received probationary sentences or, in the alternative, much shorter sentences than what the Guidelines currently recommend.

**B.  Roughly Half of Tax Offenses Result in Probation or Split Sentences, and the Vast Majority Result in Below Guideline Sentences**.

Nationally, in fiscal year 2016, only 52% of sentences for "tax offenses"[10], both felonies and misdemeanors, were prison only, 28% were probation only, and the remainder of sentences were split sentences or probation and confinement.[11]  In the 10th Circuit in 2016, less than half (45%) of sentences for tax offenses were prison only, 37% were probation only, and the remainder were split sentences or probation and confinement.  Id.

Nationally, in 2016, 47% of sentences for tax offenses were below guideline without buy-in from prosecutors, 28% of sentences were below guideline sentences with government buy-in, resulting in 75% of defendants convicted of tax crimes in 2016 receiving below guidelines sentences.[12]

Furthermore, on a national scale, when prison was imposed for a tax offense the mean sentence in 2016 was just 13 months, and median sentence was 10 months, for both felonies and misdemeanors.[13]  Such averages are in line with the pre-guidelines sentencing practices for those defendants who did not receive a probated sentence.

The Commission's statistics further note that, in those 2016 tax cases where

---

[10] "Tax" offenses include receipt/trafficking in smuggled property, aid, *etc.*, in tax fraud; fraud — tax returns, statements, *etc.*; fraud, false statement — perjury; failure to file or pay; tax evasion; evading import duties (smuggling); failure to collect or account for taxes; regulatory offenses — taxes; failure to deposit taxes in trust account; non-payment of taxes; conspiracy to avoid taxes; and offenses relating to withholding statements.  Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2016/AppendixA.pdf#page=3, accessed January 11, 2018.

[11] See, Attachment C - USSC Statistical Information 2016.
[12] Id.
[13] Id.

sentencing judges handed out a below guideline sentence citing the *Booker* decision and 3553(a) factors, the median sentence was cut by 99.8% and the median sentence was 0 months.[14]

The number of non-guideline sentences for tax offenses, in large part, may be based on the realization that the guidelines in general, but specifically the loss charts that drive the guidelines, were not the product of the Sentencing Commission employing an empirical study, but instead, "[t]he history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as the amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *United States v. Coursey*, 723 F.3d 366 (2nd Cir. 2013) (Underhill, J., concurring).

The disparity between sentences recommended under the guidelines and sentence actually imposed is compounded in this case due to the breadth of conduct covered by the applicable guideline. U.S.S.G. § 2T1.1 applies to a misdemeanor conviction, like Mr. Shryock's, for failure to file a tax return, and also to a felony conviction for Attempt to Evade or Defeat Tax.[15] The guideline disregards the severity of the conviction and the base offense level is determined by application of the Tax Table in § 2T1.4, absent a circumstance addressed in subsection (c)(1)(A-D), which in a case like this means you have a guideline that is double the statutory maximum. Clearly, the distinction between a misdemeanor and a felony cannot be overlooked simply because the tax guideline has been conflated to apply the same base offense level and specific

---

[14] Id.

[15] The Commentary to § 2T1.1 references the statutory provisions of 26 U.S.C. §§ 7201, 7203 (other than a violation based upon 26 U.S.C. § 6050I), 7206 (other than a violation based upon 26 U.S.C. § 6050I or § 7206(2)), and 7207.

offense level increase due to loss amount to crimes that are vastly different in severity both based on their elements and their statutory sentencing ranges.

## IV.   **A Condign Sentence.**

Section 3553(a)'s parsimony clause instructs that a Court impose a sentence that is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, to protect the public from further crimes, and to afford the defendant with needed training, medical care, or treatment. A sentence of probation satisfies these factors.

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?, 89 Minn. L. Rev. 571, 590 (February 2005). The guidelines include none of the factors bearing on Mr. Shryock's degree of culpability.  The harm here is clearly the loss of the taxes Mr. Shryock owed to the Internal Revenue Service. His degree of culpability relates to his willful failure to file tax returns.

**A.  Punishment and Deterrence**.  18 U.S.C. § 3553(a)(2), (A,B)

A conviction and sentence to probation will deter Mr. Shryock from further criminal conduct.  While under supervision any non-compliance could result in a resentencing by this Court with the possibility of imprisonment, and due to his state supervision, any non-compliance could result in a felony conviction entering and further prison time.

Given the specific harm to be addressed by a sentence in this matter, namely the monetary loss to the IRS, lengthy supervision with the requirements of paying restitution and financial supervision, which is further motivation for law abidance, outweighs any benefit that incarceration followed by one year of supervision may have.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[16] Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.[17] The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of

---

[16] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

[17] *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF.

imprisonment.[18] According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

The need for this sentence to reflect the sentencing purpose of "general deterrence" is questionable. Katelyn Carr addresses deterrence in her recent article "*An Argument Against Using General Deterrence as a Factor in Criminal Sentencing*".[19] The theory of deterrence presumes "offenders turn to crime because they view the benefits of crime as outweighing the costs of crime." Id. The underlying rationale is that "punishment is to dissuade would-be criminals from engaging in criminal activity by increasing the costs of crime, relative to the benefits." Id. The theory of deterrence "is responsible for policies including mandatory minimum sentencing." Id.

Ms. Carr explains the background of the "general deterrence" theory is based in two shaky foundations:

> The first is that **offenders are "rational calculator[s], motivated to maximize (or at least optimize) personal gain**." Under this "rational actor" presumption, "[g]iven the opportunity to commit a criminal act, the person presumably weighs the costs and rewards of doing so in comparison to other behavioral options."
>
> Second, **deterrence reasoning presumes a causal link between "the workings of the criminal justice system (the objective properties of punishment) [and] the perceptual properties of punishment held by the individuals to crime** and, in turn, both of these properties of punishment to crime."

---

[18] *See* David Weisburd *et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, supra, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

[19] Carr, Katelyn, "*An Argument Against Using General Deterrence as a Factor in Criminal Sentencing*", 44 Cumb. L. Rev. 249, 2014.

As Ms. Carr concludes in her "Argument Against Using General Deterrence as a Factor in Criminal Sentencing":

> The argument over the appropriate purpose of criminal sentencing has been raging for decades and continues to divide scholars. The question whether to promote societal benefits under a utilitarian theory, or just deserts under a retributive theory, is not likely to end anytime soon. One thing, however, can be said with certainty: **if available evidence indicates that sentencing schemes that increase the severity of criminal sentences in an effort to deter crime fail to negatively affect crime rates, such policies serve no purpose; thus, they should be omitted from both state and federal criminal codes.**

**B.  There is No Need for Incapacitation.**

Mr. Shryock is 38 years old, gainfully employed, able to pay restitution, and under highly restrictive conditions of economic crime probation until 2020.  He has pled guilty to a misdemeanor tax offense, has not been convicted of a crime of violence, or otherwise similarly serious "tax" offense such as tax evasion as identified by the USSC.  He's remained compliant with his state supervision for 19 months to date, and has remained compliant with his personal recognizance bond in the instant matter for 15 months.  Mr. Shryock has demonstrated an ability to abide by court ordered conditions of supervision that severely reduce any risk of recidivism.

**V.      The Kinds of Sentences Available.  18 U.S.C. § 3553(a)(3)**

Mr. Shryock can be sentenced to probation or up to 12 months in prison. Mr. Shryock is eligible for not less than one year and not over 5 years' probation under 18 U.S.C. § 3561(c)(1). Under 18 U.S.C. §§ 3563(a) and (b) the Court shall impose "mandatory conditions" of probation requiring that Mr. Shryock not commit other crimes; pay restitution or work in community service, not unlawfully possess or use controlled substances and submit to drug testing; pay any assessment imposed; and notify the court

14

of any material change in economic circumstances that might affect his ability to pay restitution.

18 U.S.C. § 3563(b)(10-12), and (19) provide that the court may impose the discretionary conditions of intermittent imprisonment, residence in a community corrections facility, home detention, and community service, if they are related to 3553(a) factors and involve reasonably necessary deprivations of liberty.

Under 18 U.S.C. § 3563(b)(10), a term of probation may include the discretionary condition of intermittent imprisonment "during nights, weekends, or other intervals of time during the first year of the term of probation." U.S.S.G § 5F1.8 also states that "[i]ntermittent confinement may be imposed as a condition of probation during the first year."

Under 18 U.S.C. § 3563(b)(19), a term of probation may include a condition that requires Mr. Shryock to remain at his residence during non-working hours, which can be monitored telephonically or electronically. Such a condition may be imposed only as an alternative to incarceration. *Id.*

The Court may also impose other relevant discretionary conditions of supervision that would require that Mr. Shryock continue to work at suitable employment; and undergo available psychiatric, or psychological treatment. 18 U.S.C. § 3563(b).

The "Legal Resource Guide to the Bureau of Prisons" provides that the coordination of "intermittent confinement" is coordinated by the BOP Residential Reentry Management office and monitored by United States Probation.[20] Section IV. A. 2

---

[20] https://www.bop.gov/resources/pdfs/legal_guide.pdf, at pg. 10, accessed January 10, 2018.

(Sentencing Issues: Probation and Conditions of Probation: Intermittent Confinement) states as follows:

> Weekend terms and other forms of intermittent confinement may be imposed as a special condition of probation or supervised release. See 18 U.S.C. § 3563(b)(10). Ordinarily in these instances, the respective BOP Residential Reentry Management office will coordinate the assignment of an appropriate non-BOP detention facility, and the United States Probation Office will monitor the defendant's period(s) of intermittent confinement.

**VI.    Conclusion.**

A sentence of probation with standard and discretionary conditions is sufficient, but not greater than necessary, to achieve the goals and purposes of sentencing. Such a sentence would adequately reflect the seriousness of the offense, promote respect for the law, provide adequate deterrence and protection from further crimes, while, at the same time, reflect the unique personal history and characteristics of Mr. Shryock.

The harm caused by Mr. Shryock is monetary loss to the IRS.  The sentence here should mitigate that harm by allowing the IRS to receive restitution, which requires Mr. Shryock to continue working.  A five-year sentence of probation will bring with it structure, conditions that will address Mr. Shryock's personal and business finances, and reinforce those conditions that Mr. Shryock has complied with for 19 months while on state supervision.  Non-compliance in the instant matter will not only subject Mr. Shryock to resentencing for the misdemeanor to which he has pled guilty, but revocation of his deferred judgment in Adams County, a felony conviction, and resentencing on both a felony and misdemeanor in state court.  The potential consequences of non-compliance are significant for their deterrent effect, and length of time that deterrence will remain in place.

A probated sentence, in addition to the substantial collateral consequence of a conviction would also be in line with the empirical data of past practice and pre-guidelines sentencing. Additionally, based on fiscal year 2016 statistics, a variance to the degree sought here, would not create an unwarranted disparity. Accordingly, Mr. Shryock would ask the Court to impose the recommended sentence of 5 years' probation.

Respectfully submitted,

s/ Brian R. Leedy
Brian R. Leedy
Stimson Glover Stancil Leedy
1875 Lawrence St. Suite 420
Denver, CO  80202
Telephone:  720-644-8066
brian@sgslattorneys.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2018, I electronically filed the foregoing

**DEFENDANT'S MOTION FOR A VARIANT SENTENCE**

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Martha A. Paluch
U.S. Attorney's Office-Denver
Email: Martha.paluch@usdoj.gov


and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Adam C. Shryock (electronic delivery)



                                      s/ Brian R. Leedy
                                      Brian R. Leedy
                                      Stimson Glover Stancil Leedy
                                      1875 Lawrence St. Suite 420
                                      Denver, CO  80202
                                      Telephone:  720-644-8066
                                      brian@sgslattorneys.com